**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Jeffrey E. Boorn, | : | Case No. 4:09-CV-2591 |
| Plaintiff, | : | |
| v. | : | **M E M O R A N D U M  DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying his claim for Child's Insurance Benefits (CIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416(i) and 423. Pending are the parties' Briefs on the Merits (Docket Nos. 16 and 21). For the reasons that follow, the Commissioner's decision is affirmed.

**I. PROCEDURAL BACKGROUND.**

On December 13, 2007, Plaintiff filed an application for CIB alleging disability beginning March 1, 1975, due to depression, dependent personality traits, asthma and back problems. His application was denied initially, upon reconsideration and by an Administrative Law Judge (ALJ) following two hearings (Tr. 35, 41, 46, 189, 206). At the second hearing on May 13, 2009, before ALJ James Pileggi, Plaintiff, who was represented by an attorney, his parents and a vocational

expert (VE) Samuel Edelmann testified (Tr. 206). ALJ Pileggi issued an unfavorable decision on June 16, 2009 finding that Plaintiff was not disabled as defined by the Act prior to March 22, 1983, the date he attained age 22 (Tr. 14-22).

On September 4, 2009, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Tr. 4-7). Plaintiff filed a timely Complaint in this Court seeking judicial review.

## II. FACTUAL BACKGROUND.

**A.     TESTIMONY AT THE ADMINISTRATIVE HEARINGS.**

At the January 22, 2009 hearing, the ALJ focused upon Plaintiff's work history as the agency had earlier denied an award of CIB based upon a finding that Plaintiff had substantial gainful activity in 1999. Such employment was performed after Plaintiff attained age 22 thereby precluding a favorable finding (Tr. 191).

Plaintiff was the only witness at the January hearing, and he testified regarding his work history and earnings for the years 1978 through 2003. With the exception of 1999, his earnings record shows very minimal or no income at all between 2004 to the date of the hearing (Tr. 194).

During 1999, Plaintiff was employed by Dynamic Technical of Dallas, Texas. He was actually hired by a subcontractor friend whom Plaintiff had known since age 10. Plaintiff testified that the contract job consisted of installing optical carriers in federal facilities. Each facility was staffed by on site technicians. Plaintiff worked as a "gopher" getting coffee and retrieving nuts and bolts or other requested items from the nearby company truck (Tr. 194-195, 202).

Plaintiff was part of a traveling work group of about 90 workers, 40 of whom traveled to the

work site from Ohio and Pennsylvania. Plaintiff testified that he also performed storeroom, stockroom or "pretend" duties (Tr. 196-7). Plaintiff was paid $10 per hour and worked 32 weeks but worked less that 40 hours for 18 of those weeks. Plaintiff and his father alleged that the work crew was being paid even though the crew was not performing any work; consequently, they reported this alleged misuse of company resources to company stockholders. Subsequently, all 95 employees were terminated (Tr. 197, 201-203).

The ALJ conducted a supplemental hearing on May 13, 2009, to address Plaintiff's condition between the ages of 18 and 22 (Tr. 209). Plaintiff, represented by counsel, his parents and a VE testified. Plaintiff stated that he experienced mental health problems since his early childhood; however, he had no recollection of going to the emergency room because of mental health problems between ages 18 and 22 or consulting a psychiatrist, psychologist or mental health therapist during that period (Tr. 211-212).

Plaintiff attended regular classes and graduated from the Bristolville, Ohio High School in 1979 (Tr. 212, 221). After graduating, Plaintiff experimented with drugs and alcohol (Tr. 212-213). His drug use did not appear to affect his mental health condition (Tr. 213-214).

Although Plaintiff did not live with his father, William Eugene Boorn, for the full year of 1979, he visited his father on a daily basis and accompanied him to work. Plaintiff's father worked the afternoon shift drilling water wells. While at work, Plaintiff delivered large quantities of water to his father on an hourly basis. (Tr. 249-250).

During the period of ages 18-22 (1979-1983), Plaintiff lived with his parents; however, he did not remember their suggesting that he see a psychiatrist (Tr. 214-215). He did recall discussing his moods with his family physician who lived across the street and with whom Plaintiff spent six

to seven hours weekly (Tr. 215-216). His family physician never recommended or suggested that Plaintiff consult a psychiatrist (Tr. 216). Plaintiff submitted an affidavit from Mr. Kamentti with whom he had worked for nine months on the "make work" job in 1999; however, they have subsequently had no contact (Tr. 216-218).

Plaintiff testified that his condition remained the same at the time of the hearing as prior to age 18 and during the period of age 18 to 22 (Tr. 225, 226). In fact, he testified that his mental condition has remained unchanged throughout his life (Tr. 221). Plaintiff described his physical problem as anhidrotic ectodermal dysplasia (AED) and explained that he was born without sweat glands. After reviewing the report prepared by Dr. Malvasi as to his ability to do work-related activities, Plaintiff initially agreed with the report; however, upon questioning by the ALJ, Plaintiff noted the inaccuracy of some of Dr. Malvasi's statements (Tr. 225-230). Plaintiff admitted that when he was between ages 18 and 22, his only physical problem was the sweat gland disorder which manifested itself when he exerted himself. He also acknowledged that Dr. Malvasi's limitation that he could never kneel, crawl or crouch was not exactly accurate. As to manipulative limitations, Plaintiff testified that nothing was wrong with his fingers or hands; however, his asthma prohibits exposure to fumes, odors and chemicals (Tr. 229-230).

Plaintiff's father testified that his son no longer lives with him; but lived with him until 1975 and did so again at age 20 in 1981. Plaintiff moved to his own residence when his father remarried Plaintiff's mother, Alice (Tr. 232-233). Plaintiff visited his father about every other day (Tr. 232-234).

Plaintiff's paternal relatives had a history of violence and being institutionalized for mental problems and criminal conduct (Tr. 221-223). Prior to his being evaluated by Dr. Pecorellli,

Plaintiff's relatives provided his written medical history to Dr. Pecorelli (Tr. 224).

Plaintiff's father confirmed the accuracy of the history to the best of his knowledge (Tr. 234-235). He testified that Plaintiff's mental condition and stability have remained unchanged throughout his life and that during the period when Plaintiff was between 20 and 22, he did not suggest that Plaintiff should seek professional psychiatric treatment.

Plaintiff's father confirmed that numerous family members had mental health problems (Tr. 235-239). He felt that Plaintiff's mental health problems were not so significant that they required specific treatment and that they could be handled within the family. In response to Plaintiff's attorney, Plaintiff's father conceded that he had dropped the ball by failing to suggest that Plaintiff seek treatment for his mental condition (Tr. 240-241).

Plaintiff's mother testified that her son resided with her between the ages 18 to 20 but was not particularly involved with his father during that period; however, the family got back together about 1984. After high school graduation, Jeffrey lived with several of his friends and saw his parents occasionally but primarily at family gatherings (Tr. 242-245). Plaintiff's mother testified that she was not aware that Jeffrey had any hospitalizations, any emergency room visits or any specific psychiatric treatment for any mental health problems between the ages of 18 and 22. She did testify, however, that she was aware that Jeffrey had mental health problems for much of his life but concluded that they were not significant enough to require hospitalization or specific mental health treatment (Tr. 245-246).

Plaintiff's mother corroborated her husband's testimony that family members had prepared and submitted to Dr. Pecorelli Plaintiff's medical history and that the history was accurate as she recalls it (Tr. 246-247). She noted a significant change in Plaintiff's mental health condition in the

13-15 year-old range when he became more distant from the family, was very withdrawn and "very, very depressed" (Tr. 247-248). The depression ultimately led to a favorable Social Security decision in 2005 and that same depression continued through ages 18 through 22 and to the present. (Tr. 248),

**B.    VE TESTIMONY**.

The ALJ asked the VE to disregard Plaintiff's employment in 1999 and to treat him as having no relevant work history. The ALJ posed a hypothetical assuming that Plaintiff is 48 years of age with a high school education and limited to sedentary work which would not require him to exert himself for a period of time thereby causing him to overheat. Furthermore, the VE was asked to assume that Plaintiff is capable of lifting more than ten pounds if he is not required to do so repeatedly and cause him to perspire. Plaintiff would be unable to work in an atmosphere of high heat or high humidity or exposure to direct sunlight for extended periods. He is limited to simple or repetitive type tasks involving routine work processes and settings and further is limited to incidental interaction with the public and low production quotas and quality standards (Tr. 250-252)

The VE responded that given the limitations stated by the ALJ, such an individual could perform jobs as a hand packer, assembler, sorter/grader and painter decorator in ceramics with about 100,000, 78,000, 30,000 and 29,000 such jobs available respectively(Tr. 252-254). The need for awareness of the temperature of objects handled would not preclude Plaintiff's ability to perform any of the listed jobs. The absence from work on an irregular basis for three or more times each month, being off task 10 to 15 percent of the work day and reacting inappropriately to supervision on more than one or two occasions would preclude an individual from performing the jobs identified by the VE (Tr. 254).

The VE stated that his testimony regarding the available jobs that the hypothetical Plaintiff

could perform is consistent with the information in the DICTIONARY OF OCCUPATIONAL TITLES and other relevant vocation sources (Tr. 256).

### III. MEDICAL EVIDENCE

Dr. L.A. Loria wrote Attorney Michael D. Rossi on May 24, 1984, providing a summary of his treatment of Plaintiff. Dr. Loria delivered Jeffrey, an underweight baby on March 23, 1961. Subsequently, Dr. Loria noted that "the usual appendages of the ectoderm were not developing" and he diagnosed Plaintiff with hereditary AED which is the absence or non-development of appendages from the ectoderm such as teeth, sweat glands and ears." Plaintiff's infancy was marked by the usual childhood diseases. He played with neighborhood children but during hot summer days, Plaintiff would lie on the garage cement floor. In 1966, he was hospitalized with an acute upper respiratory infection, and on March 1, 1979, he sustained soft tissue damage to his right knee as a result of a motorcycle accident. His last office visit was on February 13, 1983, when he was treated for acute viral gastroenteritis (Tr. 164).

Dr. Phillip P. Malvasi's letter of March 3, 2009, stated his opinion, with a strong degree of medical certainty, that Plaintiff's AED, a condition existing from birth to date, prevented Plaintiff from performing any substantial gainful employment of any nature whatsoever for any period of time (Tr. 169).

On May 5 and 9, 2009, Joseph P. Pecorelli, Ph.D., a consulting psychologist in Niles, Ohio, interviewed Plaintiff, his parents and sister, Sandra Cellio, to determine whether the condition of major depressive disorder existed prior to Plaintiff attaining age 22 on March 23, 1983. Specifically, Dr. Pecorelli addressed the issue of whether Plaintiff experienced a depressive disorder during childhood and his later developmental years, but prior to the favorable decision issued by the Social

Security Administration on August 25, 2005 (Tr. 170-180).

During the evaluation, Dr. Pecorelli conducted a telephone interview with another sister Cherly Boorn Olney and her husband, Greg, and reviewed *inter alia*, the 2005 favorable Social Security decision, records from Valley Counseling Services, Bristol School Records, letters to Dr. Malvasi and from Dr. Loria to Attorney Rossi, child social history completed by Plaintiff's mother and adult social history and autobiographical life history completed by Plaintiff.

Plaintiff reported to Dr. Pecorelli that during his developmental years, he had, *inter alia*, difficulty learning and retaining information and paying attention. He was restless and fidgety and had a difficult time sitting still, was impulsive and could not follow rules and even ran away from home. Additionally, Plaintiff was especially anxious and nervous, experienced nightmares, began bedwetting between 5 and 15 years of age, was a loner and tended to avoid others and had problems of "killing things, building explosives and enjoying guns"(Tr. 170-175).

Plaintiff also advised Dr. Pecorelli that he had psychological and psychiatric intervention through Valley Counseling from 2000 to present. He was receiving treatment for major depression and was awarded Social Security benefits as an adult due to depression (Tr. 177).

Dr. Pecorelli concluded with reasonable psychological certainty that Plaintiff did experience a major depressive disorder or the same condition was in existence prior to his attainment of age 22 on March 23, 1983. It was Dr. Pecorelli's opinion that Plaintiff did experience emotional distress characterized as major depression during his development and formative years as a young child and adolescent male (Tr. 179).

### IV. STANDARD OF DISABILITY.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475

F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Plaintiff can be eligible for disabled child's insurance benefits if he is 18 years or older and can establish a disability before attaining age 22. 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5).

Second, plaintiff must show that she or he suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities. *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id*.

Fourth, if the plaintiff's impairment does not prevent his or her from doing his or her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent him or her from doing his or her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id*. (*citing Heston v. Commissioner of Social Security*, 245 F.3d

528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id*. (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### V. ALJ DETERMINATIONS.

After consideration of the entire record, the ALJ made the following findings:

1. Plaintiff was born on March 23, 1961, and had not attained age 22 as of March 1, 1975, the alleged onset date

2. Plaintiff had engaged in substantial gainful activity subsequent to the date he attained the age of 22 on March 23, 1983; however, the ALJ proceeded with the evaluation assuming that Plaintiff's employment did not, in fact, qualify as substantial gainful activity based upon argument presented by Plaintiff's counsel that Plaintiff's seven month job for Dynamic Technical Services was merely "make work."

3. Prior to reaching age 22, Plaintiff had the following severe impairments: AED and a mood disorder, most likely depression.

4. Prior to attaining age 22, Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I (20 C.F.R. § § 404.1525 and 1526).

5. Prior to attaining age 22, Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 414.1567(a). However, Plaintiff could not have been exposed to high heat or humidity or extended periods of direct sunlight; he would have also been limited to simple, repetitive, routine work processes and settings involving no more than incidental interaction with the public and no high stress which the ALJ defined as high quotas or activity requiring high quotas or close attention to quality production standards.

6. Prior to attaining age 22, Plaintiff had no past relevant work (20 C.F.R. § 404.1565).

7. Plaintiff was born on March 23, 1961 and was 13 years old, which is defined as a younger individual age 18-44 on the alleged disability onset date (20 C.F.R. § 404.1563).

8. Plaintiff has at least a high school education and is able to communicate in English

9. Transferability of job skills is not an issue in this case because the claimant had no past relevant work.

    10.    Prior to attaining age 22, considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed.

    11.    Plaintiff was not under a disability as defined under the Act at any time prior to March 22, 1983, the date he attained age 22 (20 C. F. R. 404.350 (a)(5) and 4504.1520(g)) or 1996 through June 30, 2001.

The ALJ concluded that based on the application for child's insurance benefits filed on December 13, 2007, Plaintiff was not disabled as defined in Section 223(d) of the Act prior to March 22, 1983, the date he reached age 22 (Tr. 14-22).

## VI. STANDARD OF REVIEW

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id.* (*citing Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. (*citing Kirk v. Secretary of Health and Human Services*, 667 F. 2d 524, 535, (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id.* (*citing Kirk, supra*, 667 F. 2d 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would

decide the matter differently. *See Kinsella v. Schweiker*, 708 F. 2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F. 2d 535, 545 (6th Cir. 1986) (en banc).

### VII. DISCUSSION

Plaintiff argues that the decision of the Commissioner should be reversed because the ALJ erred in finding that Plaintiff's impairments, prior to age 22, failed to meet or equal one of the listed impairments. Plaintiff further seeks a ruling by this Court that Plaintiff was, in fact, disabled prior to attaining age 22.

The Commissioner requests that the Court affirm the ALJ's decision that Plaintiff was not disabled prior to attaining age 22 as being supported by substantial evidence.

At step three of the sequential analysis, the ALJ found that the Listings set forth in Appendix 1 contain no category to accommodate Plaintiff's AED, "a sweat gland disorder since birth which made it difficult for him to be exposed to humidity, high temperatures or directed sunlight for extended periods." Plaintiff contends that his disorder satisfies Listing 8.07 for "Genetic Photosensitivity Disorder" and 12.04 for Mental Impairment.

**1. LISTING 8.07**

Genetic photosensitivity disorders are evaluated under Section 8.00 E (2) which provides in pertinent part:

> 2. Other genetic photosensitivity disorders. Other genetic photosensitivity disorders may vary in their effects on different people, and may not result in an inability to engage in any gainful activity for a continuous period of at least 12 months. Therefore, if you have a genetic photosensitivity disorder other than XP (established by clinical and laboratory findings as described in 8.00E3), you must show that you have either extensive skin lesions or an inability to function outside of a highly protective environment to meet the requirements of 8.07B. You must also show that your impairment meets the duration requirement. By inability to function outside of a highly protective environment we mean

>   that you must avoid exposure to ultraviolet light (including sunlight passing through windows and light from unshielded fluorescent bulbs), wear protective clothing and eyeglasses, and use opaque broad-spectrum sunscreens in order to avoid skin cancer or other serious effects.
>   To satisfy the photosensitivity listing, the Agency requires Clinical and laboratory findings.
>
>> a. General. We need documentation from an acceptable medical source, as defined in §§ 404.1513(a) and 416.913(a), to establish that you have a medically determinable impairment. In general, we must have evidence of appropriate laboratory testing showing that you have XP or another genetic photosensitivity disorder. We will find that you have XP or another genetic photosensitivity disorder based on a report from an acceptable medical source indicating that you have the impairment, supported by definitive genetic laboratory studies documenting appropriate chromosomal changes, including abnormal DNA repair or another DNA or genetic abnormality specific to your type of photosensitivity disorder.
>>
>> b. What we will accept as medical evidence instead of the actual laboratory report. When we do not have the actual laboratory report, we need evidence from an acceptable medical source that includes appropriate clinical findings for your impairment and that is persuasive that a positive diagnosis has been confirmed by appropriate laboratory testing at some time prior to our evaluation. To be persuasive, the report must state that the appropriate definitive genetic laboratory study was conducted and that the results confirmed the diagnosis. The report must be consistent with other evidence in your case record.

20 C.F.R. Part 404, Subpart P., Appendix l. Section 8.07(2)(a),(b) (Thomson Reuters 2011).

Plaintiff argues that medically he satisfied Listing 8.07B because he was unable to function outside of a highly protective environment for a continuous period of at least 12 months. Plaintiff did not, however, submit the required laboratory findings to confirm the diagnosis. Consequently, Plaintiff failed to satisfy all the requirements of the Listing. *See Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (lack of evidence indicating the existence of all the requirements of a listing provides substantial evidence to support the Secretary's finding that Plaintiff did not meet the listing). Further, Plaintiff must show that he is 18 years or older and that his disability began before age 22. 20 C.F.R. § 404.350(a)(5). The record fails to include laboratory findings to support Plaintiff's claims that he

meets the listing for photosensitivity and that such findings support his claim that the disability began before he attained age 22 on March 23, 1983.

Dr. L.A. Loria wrote to Plaintiff's attorney on May 24, 1984, and confirmed the diagnosis of AED characterized by "the absence or non development of appendages from the ectoderm such as teeth, sweat glands and ears" (Tr.164). Dr. Loria recounts Plaintiff's childhood medical disorders to include: during 1966 an acute upper respiratory infection from which Plaintiff recovered uneventfully, a motorcycle accident involving a soft tissue injury to the right knee in 1979, and acute viral gastroenteritis (Tr. 164). Although Dr. Loria's report includes a comment that during summer days when Plaintiff became too hot, he would go inside and lie on the garage cement floor, no finding was made by Dr. Loria that the duration of Plaintiff's disability would exist for a continuous period of at least 12 months and that Plaintiff had an inability to function outside of a highly protective environment for a continuous period of at least 12 months.

Dr. Malvasi's letter of March 3, 2009, expressed his opinion with a strong degree of medical certainly that Plaintiff's AED "was a condition from birth that has continued to date and prevents him from performing any substantial gainful employment of any nature whatsoever for any period of time (Tr. 169). Dr. Malvasi explained: "The ectoderm contributes to the formation of many parts of the body, including the skin, sweat, hair, teeth and nails. During embryonic development, these and/or other parts of the body, including the lens of the eye, parts of the inner ear, the fingers and toes or nerves, among others that fail to develop normally" (Tr. 169) The letter, however, was not supported by laboratory findings

The undersigned finds that the ALJ reasonably concluded that Plaintiff's impairments did not meet or equal the criteria of any listing set forth in Listing Section 8.0l (Tr. 17).

**2.     LISTING 12.04**

Plaintiff contends that the ALJ erred by finding that Plaintiff's impairments did not meet or equal Listing 12.04. After considering all the relevant evidence, the ALJ determined that Plaintiff had a mood disorder, most likely depression, but that prior to attaining age 22, his impairments did not meet or equal a listed impairment.

Listing 12.00 addresses mental disorders and states in pertinent part:

"The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months."

Listing 12.04 has two prerequisites: Part A requires that Plaintiff establish an affective mental disorder. Part B requires at least two of the following resulting limitations: marked restriction of activities of daily living or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. 20 C.F.R. Part 404, Subpart P., Appendix l. Section 12.04 A, B (Thomson Reuters 2011).

The ALJ reasonably found that without documented evidence substantiating the claims from Plaintiff and his parents about the nature and severity of his mental impairment, Plaintiff was not markedly or extremely limited in any of the Part B criteria of listing 12.04. The ALJ pointed out that Plaintiff completed high school in a regular curriculum, consulted only his guidance counselor for any special concerns, presented no evidence of severe difficulty relating to his parents or others during the pertinent period, currently maintains a relationship with two or three friends from high

school and dated throughout high school. The ALJ pointed out that no documented clinical information supporting an impairment in concentration, attention, memory or cognitive deficits was submitted. No clinical evidence documenting minimal mental health counseling or the use of psychotropic medications for the period prior to attainment of age 22 was submitted as evidence of episodes of decompensation.

The ALJ also evaluated Plaintiff under Part C and found no evidence of repeated episodes of decompensation, each of an extended duration or at least one year of inability to function outside a highly supportive living arrangement.

After finding at step three that Plaintiff did not meet a Listing, the ALJ proceeded to the fourth and fifth steps of the disability analysis and assessed his residual functional capacity.

The regulations charge the ALJ with the responsibility for deciding a claimant's residual functional capacity when cases are decided at an administrative hearing. *Converse v. Astrue,* 2009 WL 2382991, *8 (S. D. Ohio 2009) (*citing Webb v. Commissioner of Social Security,* 368 F.3d 629, 633 (6th Cir. 2004) (citations omitted); 20 C.F.R. §§ 404.1546; 404 .1527(e)(2)). A claimant's residual functional capacity is an assessment of physical and mental work abilities-what the individual can or cannot do despite his or her limitations. *Id.* (*citing* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002)). The Commissioner explains through his rulings that residual functional capacity is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. *Id*. The regulations deem the terms "regular and continuing basis" to mean "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* (*citing* SSR 96-8p; *See* http://www.ssa.gov/OPHome/rulings/rulings.html (emphasis in original)).

In assessing residual functional capacity, the regulations distinguish residual functional capacity and a medical source opinion about claimant's work abilities. *Id.* Residual functional capacity "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id.* (*citing* SSR 96-8p).

The ALJ considered Plaintiff's testimony that he was born without sweat glands and has always had difficulty with warm temperatures. Plaintiff testified that if he overexerts himself, especially with lifting, carrying, standing and walking, he has a tendency to faint and further that he has suffered from asthma since birth and has to avoid fumes. The ALJ considered Plaintiff's testimony that he graduated from high school in 1979 and did not receive any special assistance during his high school years, seeing only a guidance counselor. Although Plaintiff testified that he had mental difficulties throughout his life, he did not undergo any specific treatment for any mental health disorder prior to the attainment of age 22. Both parents testified that they did not believe that Plaintiff needed to see any physician about his mental health problems. The ALJ properly considered the effects of Plaintiff's non-exertional and mental impairments in assessing what work Plaintiff was capable of performing.

The ALJ found that prior to attaining age 22, Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a) but could not have been exposed to high heat or humidity or extended periods of direct sunlight. Plaintiff would have also been limited to simple, repetitive, routine work processes and settings, involving no more than incidental interaction with the public and no high stress which is defined as high quotas or close

attention to quality production standards.

The undersigned finds that the ALJ's decision that Plaintiff, prior to attaining age 22, could have performed jobs that exist in significant numbers in the national economy and that Plaintiff was, therefore, not disabled is supported by substantial evidence.

### VIII. CONCLUSION.

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.


                                           /s/Vernelis K. Armstrong
                                           United States Magistrate Judge

Date: March 29, 2011